## ROY CLARK v. STATE.

No. A-9349.   April 14, 1938.
(78 P. 2d 710.)

W. C. Henneberry, of Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., for the State.

DOYLE, J. The information in this case, filed in the district court of Tulsa county, August 12, 1936, in substance charged that Wade Tunnell and Roy Clark, on the 16th day of June, 1936, in said county, did unlawfully, fraudulently, and feloniously take, steal, and carry away, without the consent of the owner thereof, $431 good and lawful money of the United States, the personal property of one Vassie Tyler, with the unlawful and felonious intent on the part of said defendants and each of them to deprive the owner thereof and convert the same to their own use and benefit.

On his separate trial the jury returned their verdict finding the defendant Roy Clark guilty as charged in the information and assessed his punishment at confinement in the state penitentiary for a term of two years. From the judgment rendered in pursuance of the verdict, on December 14, 1936, an appeal was taken by filing in this court on June 11, 1937, petition in error with case-made.

The assignments are that the verdict is contrary to law and is not sustained by sufficient evidence, and that the court erred in overruling the defendant's motion for a new trial.

No brief has been filed, and no appearance made in behalf of plaintiff in error in this court.

Without going into a detailed statement of the state's evidence, it shows that Vassie Tyler, a farmer and stockman, living in Osage county, in the month of June was in the town of Hominy, there met a man he knew as Buck Mitchell, who told him that he knew some parties who had some good bonds they would sell cheap. A few days later the defendant Wade Tunnell came to see Tyler at his home and told him he could get a considerable amount of Liberty bonds that were not "hot," but that the parties who had the bonds were "hot," that the party who had them would sell and deliver them to Tyler for $215 for each $1,000 bond;

it was also understood that some of Tyler's friends would put up money to buy some of these bonds.

On the 15th day of June, Wade Tunnell came to Tyler's home, and after talking the matter over with Tyler and Lee Coffey, who was there, it was agreed that they would go to Sand Springs and make the deal there. Tunnell drove to the Smith Tourist Camp, near Sand Springs; there Tyler and Coffey met the defendants Roy Clark and Tunnell, and Tyler insisted on seeing the bonds; the defendants Tunnell and Clark insisted upon seeing the money. Tyler did not have the money with him, so they arranged to meet again at Smith's Tourist Camp the next afternoon; Tyler went to the bank in Hominy and got $431, Coffey went to Cleveland and got $320; when they returned to Smith's Tourist Camp, the defendant Tunnell was seated in a car, parked before a cabin. Tyler in the cabin asked to see the bonds, the defendant Clark asked to see his money, so Tyler and Coffey counted their money out on a table, the defendant Clark picked it up as if to count it, then ran out and jumped in the car with Tunnell and they drove away. Tyler had the license number of the car and found that Tunnell was the owner. About two weeks later the defendant Clark was arrested in Tulsa. He gave his name as Wilson, but was positively identified by Mr. Tyler as the defendant Roy Clark.

As a witness in his own behalf, Roy Clark testified that he lived at Barnsdall; that he first met the complaining witness Tyler at his home in June, 1936; that Wade Tunnell about a week previous asked him if he knew where he could get some "hot" bonds cheap, and told him that this man, Tyler, wanted to buy some "hot" bonds, and he told him he had met a man who had some; Tunnell said, "Get in the car and go out with me," Mr. Tyler is in the market for some of them and witness would have a chance to make $20 or $25; so they drove out to Mr. Tyler's place, near Prue, and Tunnell introduced witness to Mr. Tyler, and said, "Here is the man who says he can get the bonds for you." Mr. Tyler

said, "Well, if you can get me some government bonds at that price, $215 a thousand, I can handle them." That witness then went to Tulsa to meet the man that had the bonds and he said he could sell the man the bonds. They then drove back to the Smith Cabins, just across the river from Sand Springs. Mr. Tyler said, "I didn't bring the money with me"; it was then agreed that the next day Mr. Tyler would meet them at the post office in Sand Springs. He was there with Tunnell and met Mr. Coffey and Mr. Tyler there. Tyler said, "I didn't bring the money," and he told him he could not handle the bonds unless he had the money to take to the man. Tyler then said, "I will get the money." Witness said, "All right, meet me over there at the Smith's Cabins." That afternoon they met there. Tyler said, "I am ready to buy the bonds if you can get them for me." Witness said, "All right, you understand I will have to have the money to go in there and get them, I am just working as an agent between you two gentlemen." Mr. Tyler counted and laid his money on the table; witness said, "I want to be sure just how much money you have got here," and picked it up and counted it, then witness wrote an agreement and signed it. Roy Gains and Mr. Tyler signed it. Witness then took the money and went out and got in Tunnell's car and they drove to Tulsa to make this transaction. There they met a man that Tunnell introduced to him as Blackie Prince, they were on the mezzanine floor of the Mayo Hotel. Witness told Prince he was ready to buy the bonds. Prince said, "The gentleman that has these bonds is on the fourth or fifth floor, but he would not let him see him under any consideration," and said, "if you will give me the money I will go up there and get you the bonds and bring them back and deliver them to you here;" that he gave Prince the money; that he has not seen Prince since; that he had not informed Mr. Tyler as to what happened.

No other witness testified on the part of the defense.

At the close of the evidence a motion was made by the defendant for a directed verdict of acquittal on the ground "that the state has failed to prove sufficient allegations to sustain the information," which was overruled. Exception taken.

Where no briefs are filed or oral argument made, we do not consider it the duty of this court to go into a careful examination of the evidence to determine whether or not the trial court erred in its rulings on the admission or exclusion of evidence.

In this case we have examined the record and find it free from substantial error. As to the sufficiency of the evidence to sustain the verdict, we think there can be no reasonable doubt. The jury evidently did not believe the explanation made by the defendant. The instructions given by the court, to which no objection was made or exception taken, fully covered the law of the case.

It is apparent from the record before us that the defendant had a fair and impartial trial and was properly convicted.

The judgment of the trial court is therefore affirmed.

DAVENPORT, P. J., and BAREFOOT, J., concur.